UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 25-mj-854 (DTS) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Courtroom 9E |
| Maxwell Louis Collyard, a/k/a Gloria Louis Collyard, | ) | Minneapolis, Minnesota<br>Tuesday, December 30, 2025<br>9:30 a.m. |
| Defendant. | ) | |

---

BEFORE THE HONORABLE SHANNON G. ELKINS
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**(PRELIMINARY HEARING)**

APPEARANCES:

For the Plaintiff: UNITED STATES ATTORNEY'S OFFICE
BY: THOMAS CALHOUN-LOPEZ
300 South Fourth Street, #600
Minneapolis, Minnesota 55415

For the Defendant: DE LEON & NESTOR, LLC
BY: BRUCE D. NESTOR
3547 Cedar Avenue South
Minneapolis, Minnesota 55407

Court Reporter: RACHEL C. BRAUN, RPR-CRR-CRC
United States District Courthouse
300 South Fourth Street, Box 1005
Minneapolis, Minnesota 55415

Proceedings reported by certified court reporter; Transcript produced with computer.

# I N D E X

PAGE

**MICHAEL RAIFF**
Direct Examination by Mr. Calhoun-Lopez 4
Cross-Examination by Mr. Nestor 15

* * *

**P R O C E E D I N G S**

**IN OPEN COURT**

*(Defendant present)*

THE COURT: Good morning. Please be seated.

We are here in the matter of United States of America vs. Maxwell Louis Collyard, 25-MJ-854. I am Magistrate Judge Shannon Elkins, and this is the United States District Court.

My understanding is that we're here today for a probable cause hearing, but the issue of detention was already resolved, and defendant was released previously. Is that correct, Mr. Nestor?

MR. NESTOR: It is, Your Honor.

THE COURT: I should probably get the appearances of the parties, starting with the government.

MR. CALHOUN-LOPEZ: Good morning, Your Honor. Thomas Calhoun-Lopez. With me at counsel table is Special Agent Michael Raiff from the Department of Homeland Security Investigations.

THE COURT: Good morning to both of you.

And, Mr. Nestor?

MR. NESTOR: Good morning, Your Honor. Bruce Nestor on behalf of Gloria Collyard, legal name Maxwell Louis Collyard, who appears personally seated to my left.

THE COURT: So Collyard, that's how you say that

MICHAEL RAIFF - DIRECT 4

correctly?

THE DEFENDANT: Yep.

THE COURT: All right. And you're still challenging probable cause?

MR. NESTOR: Yes.

THE COURT: And does the government have any witnesses today?

MR. CALHOUN-LOPEZ: We have one witness, Your Honor.

THE COURT: Okay. Let's begin.

MR. CALHOUN-LOPEZ: The United States calls Michael Raiff.

THE COURT: Special Agent Raiff, if could you just stand here (indicating) and raise your right hand, please?

*(Witness Sworn)*

THE COURT: Go ahead, Mr. Calhoun-Lopez.

**(MICHAEL RAIFF)**

**DIRECT EXAMINATION**

BY MR. CALHOUN-LOPEZ:

Q. Good morning.

A. Good morning.

Q. What are your duties for the Department of Homeland Security Investigations?

A. So we're criminal investigators assigned to investigate a wide variety of crimes from transnational criminal

organizations, to financial crimes, child exploitation, and various violations of Title 18.
Q. How long have you been with HSI?
A. I have been with HSI since March of 2025.
Q. Do you have any prior law enforcement or military experience?
A. I have prior military experience; I served ten years in the Army.
Q. What did you do with the Army?
A. I was a logistics and special forces officer.
Q. Are you the case agent in this investigation?
A. I am.
Q. In that capacity, have you conducted interviews of witnesses in this case?
A. Yes, I have.
Q. Have you reviewed reports?
A. I have.
Q. Video?
A. Yes.
Q. Based on all that investigation, are you familiar with the events of December 15th as they relate to this case?
A. I am.
Q. Was there an arrest operation planned that day?
A. Yes, there was.
Q. By what agencies?

A. It was both ERO, Enforcement and Removal Operations, and Homeland Security Investigations.
Q. And were they planning on arresting -- a preplanned operation to arrest specified individuals?
A. Yes, they were.
Q. Did they locate the persons to be arrested?
A. They did.
Q. Where?
A. On West 29th and Pilsbury Avenue.
Q. In the city of Minneapolis?
A. Yes.
Q. And how many federal agents, approximately, were on scene at the initial of the arrest?
A. Three agents.
Q. Were they wearing any law enforcement markings?
A. They were. They had vests that marked them; said "Police" on their vests.
Q. In large letters?
A. In large letters, yes.
Q. Did they have a badge on as well?
A. I don't recall if they had badges or not.
Q. Are you aware of any trends in the city of Minneapolis related to federal operations?
A. Yes. As we continue to conduct operations as part of our duties here, being received with continued and

increasing violence towards agents, and the operation usually gathers a large crowd or protest that starts and begins to turn violent towards the agents themselves.

Q. What was the reaction in this case?

A. It was very similar; there was a large crowd formed and -- with violent intentions.

Q. Why do you say that; what makes you say that?

A. The agents there were surrounded by approximately 60 to 70 individuals shouting threats and throwing objects at them.

Q. Do you recall what sort of objects were being thrown?

A. Snow, rocks, ice, water bottles.

Q. Had the federal agents arrived to the scene in vehicles?

A. They did.

Q. And did the vehicles have any signifiers that identified them as law enforcement?

A. They had flashing red and blue lights on them.

Q. Did anyone in the mob do anything to any federal vehicle?

A. They did.

Q. What happened?

A. One individual of an unidentified female spray-painted the rear of one of the vehicles marked as "I.C.E."

Q. Do you recall the model of the government vehicle that was vandalized?

A. It was a Jeep Grand Cherokee.
Q. And it had been painted?
A. Yes, sir.
Q. Did you confirm that fact?
A. I did not confirm that fact.
Q. But did you confirm it by asking the witnesses on scene?
A. Yes. I asked the officer on scene.
Q. How did the federal agents respond when they saw the act of vandalism?
A. They attempted to arrest the individual who vandalized their car.
Q. Did the woman comply with the arrest?
A. She did not. She fought with agents. They were able to put one handcuff on her. They were not able to have her other arm out. She resisted the entire time and fought the agents.
Q. And, forgive me, Special Agent Raiff, if you've already said this, but approximately how many people had gathered at that point?
A. Roughly 60 to 70.
Q. Was the defendant among them?
A. Yes.
Q. Were people saying anything to agents?
A. They were making threats, saying that agents should kill themselves, that they were going to kill the agents, that

they should eat their gun.
Q. Was the defendant among those who were saying things?
A. Yes.
Q. Do you know an officer named Brenden Cuni, spelled C-u-n-i?
A. I do.
Q. What is his title?
A. He's a senior deportation and detention officer.
Q. So, an I.C.E. officer?
A. Yes, that's correct.
Q. And was he on scene?
A. He was.
Q. What was his role in the operation?
A. So he was the team leader for that specific ERO team of three individuals.
Q. Was he present at the arrest of the woman who had been vandalizing the car?
A. He was.
Q. And did he hear the defendant's threats?
A. He did.
Q. How did he respond?
A. So, he attempted to keep the crowd back as they continued to advance at his position; so he was surrounded on all sides by individuals making those threats, and so he was trying to keep the crowd calm while they could arrest

the individual spray-painting the car.
Q. And did he have any particular interactions initially with the defendant?
A. He did. So, he had made several commands to pack up and to stop approaching them as they were attempting to effect the arrest, and eventually had to utilize his OC spray to keep the mob at bay.
Q. So, let me go back a little bit. Initially, Officer Cuni was directing the defendant to back up?
A. That's correct.
Q. Did the defendant do so when Officer Cuni directed the defendant?
A. He would back up and then continue to advance any time he turned or looked a different direction.
Q. And was that a concern to Officer Cuni?
A. It was a concern. He was afraid at that time just by the sheer number of individuals in the mob who continued to press towards his location.
Q. And you said that at some point Officer Cuni deployed OC spray?
A. Yes. It's an oleoresin capsicum spray; it's a pepper spray.
Q. And I'm going to spell that for our court reporter. Is that o-l-e-o-r-e-s-i-n c-a-p-s-i-c-u-m?
A. Yes.

Q. And did he spray the defendant?
A. He did.
Q. What did the defendant do when she was sprayed?
A. The defendant looked away because the defendant was wearing ski goggles and a mask to stop the effects of the chemical irritant but continued to approach DO Cuni.
Q. At any point during this interaction, did Officer Cuni attempt to assist with the arrest of the woman who had painted the car?
A. He did. He turned and attempted to assist, at then which point the defendant continued to approach on his location, and he had to stop assisting his other officer to keep the crowd back from him.
Q. And at any point did Officer Cuni and the defendant have any physical confrontation?
A. They did.
Q. Can you describe that, please?
A. So, at one point, after being commanded to back up, the defendant had, along with other individuals, had tackled DO Cuni.
Q. So the defendant approached DO Cuni and was among people who knocked DO Cuni over?
A. Yes. He knocked him to the ground at that point.
Q. So, DO Cuni is on the ground; was he able to get free?
A. He was able to eventually fight his way free.

Q. What about the woman who had vandalized the vehicle; was she arrested?
A. She was not. She ended up escaping with the aid of the individuals in the crowd.
Q. Did the defendant's tackling of DO Cuni assist the woman to escape?
A. Yes.
Q. Now, at some point, did the officers on scene call for help?
A. They did.
Q. What sort of help did they request?
A. So, they were attempting to request a QRF, which is our Quick Reaction Force. It's just additional agents and officers in the area who can respond to assist them, as they were surrounded.
Q. And with that help were officers able to leave the scene?
A. They were eventually able to leave the scene.
Q. Did Officer Cuni ever see the defendant again?
A. He did.
Q. When did Officer Cuni see the defendant?
A. As Officer Cuni was leaving the scene, he saw the defendant in her vehicle behind him and was able to identify him based off of the jacket that she was wearing as well as the mask and the OC spray on face.

Q. Can you describe what you mean by that; how could he see OC spray on a face?
A. The OC spray leaves an orange tint after it's been utilized, and so individuals sprayed with it have a slight orange tint on their face.
Q. What did Officer Cuni do when he realized he had found one of the people who tackled him?
A. He attempted to arrest at that point.
Q. And how did he do that?
A. Him and our other officers and agents pulled Maxwell Collyard out of the vehicle and arrested at that point.
Q. And you said you had reviewed video of this incident?
A. Yes, I did.
Q. Can you describe what type of video you saw?
A. It was mainly Facebook Live footage; people livestreaming at the event in various segments, just broken pieces of what we were able to kind of put together.
Q. This is handheld cameras?
A. Handheld cameras. And then eventually Fox 9 was on scene, and they had some footage, but it was mainly fragments at that point.
Q. So there's no stationary or fixed camera that would have captured the entire incident?
A. Not that we were able to find.
Q. And did any of the video you actually see -- reviewed

show the tackling?
A. No, it did not.
Q. But does it capture other events, other confrontations between Officer Cuni and the defendant?
A. It does. It captures the defendant approaching Officer Cuni; as he described, fists clenched, an aggressive stance, fighting stance, attempting to effect his arrest.
Q. Have you ever been a part of an operation that has confronted a mob like this?
A. I have.
Q. What is the experience like?
A. It's terrifying when you're surrounded by individuals wishing you harm who are yelling threats at you continually, ignoring commands, who are approaching your vehicle, doing damage to your vehicles, and some of them were throwing rocks as well and could cause significant harm.
Q. Has Officer Cuni suffered any after effects from this incident?
A. He has. He's being severely doxed right now. His personal information as well as his parents' addresses have been released. People are making threats against him, his person, his family. Not sure, but he said he was potentially going to have to move his parents to another address to keep them safe.
Q. Thank you, Special Agent Raiff.

MR. CALHOUN-LOPEZ: Your Honor, I have no further questions.

THE COURT: Mr. Nestor.

MR. NESTOR: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. NESTOR:

Q. Agent Raiff, you indicated that you've interviewed witnesses about this incident, correct?

A. That's correct.

Q. Who did you interview?

A. I interviewed DO Cuni. He's the only one who I interviewed from that team.

Q. Any other witnesses interviewed by you?

A. No.

Q. Any other witnesses interviewed by other HSI investigators assigned to this matter?

A. Not that I recall at this time, no.

Q. My understanding is at the time that DO Cuni alleges he was tackled by the defendant that two other officers were in close proximity to him. Is that correct?

A. That is correct.

Q. Did you interview either of those two officers?

A. No. We were not able to.

Q. Have either of those two officers produced any written report that you've been able to review?

A. No, they have not.
Q. Do you know the identity of those two officers?
A. I'd have to review my notes for the exact name. I know one was DO Jusino. I don't know the third officer, though, the name.
COURT REPORTER: Can you spell Jusino?
THE WITNESS: I believe it is J-u-s-i-n-o.
BY MR. NESTOR:
Q. And do you -- separate from whether you know the identity of the third officer as you sit here today, is the identity of the third officer contained in your notes?
A. It is not.
Q. Is that typical for a criminal investigation to not interview other officers who were present and directly witnessed an assault on a federal officer?
A. I wouldn't say typical. With this operation surge that's been going on, we did not have a standard operating procedure for the team who effected an arrest like this would stay at the office for interviews at that time after they had transported individuals back to our building. They went back out into the field to continue working, and it's now our operating procedure to have them out of service until we can complete our investigation.
Q. Now, you took a recorded statement from DO Cuni. And that's C-u-n-i if we haven't spelled it yet. Is that right?

A. That's correct.
Q. And at that point he referred to, quote, they tackled us, took us to the ground, unquote, correct?
A. Without hearing the recording again, I believe that's correct.
Q. In other words, Officer Cuni claimed that this assault involved multiple I.C.E. officers being assaulted or multiple federal agents being assaulted, not just DO Cuni?
A. I believe when he said, "they," he was referring to multiple individuals tackled them.
Q. And when he said, "us," "they tackled us;" "us" is plural, correct?
A. Yes, that's correct.
Q. So, in DO Cuni's statement to you, he indicated that more than one federal agent was physically assaulted?
A. Yes.
Q. And you did not attempt to interview that other federal agent who was physically assaulted?
A. No, we were not able to.
Q. Do any of the three federal agents present at the time of the alleged assault, were they wearing body cameras?
A. No, they were not.
Q. Is that typical federal agents don't wear body cameras?
A. It is agency dependent. So, FBI does wear body cameras. Currently, Homeland Security Investigations and ERO, it is

an office dependent; so our office specifically does not have body cameras issued at this time.
Q. You indicated that this was an arrest operation by ERO and HSI, correct?
A. Correct.
Q. Specific individuals were being targeted?
A. That is correct.
Q. And those -- was that an individual or individuals?
A. From my understanding, it started as a single individual, the driver of the vehicle that they had stopped; and there was a passenger in that vehicle that they also identified was out of status, and they were able to -- was arrestable at that time.
Q. And this was for civil immigration violations, correct?
A. That's correct.
Q. And this -- so I understand, in terms of it -- I think we sometimes call these targeted operations when they're going after a particular person or persons, correct?
A. Correct.
Q. And were there two persons that were the target of this investigation or just an individual and then there was someone else in the car?
A. From what I recall, it's the second; there was another individual in the car. They had the one targeted, so.
Q. Do you know if ERO or HSI obtained civil arrest warrants

for the individual who was the initial subject of this investigation?
A. In some cases they do; in other cases it really depends on that individual and their immigration status at the time.
Q. And I'm asking about this particular case. Do you know if I.C.E. -- DO Cuni or the other two I.C.E. officers that were part of the trio carrying out this targeted operation, did they have a civil arrest warrant for any individual?
A. I'm not sure if they did or did not.
Q. You indicated that rocks were thrown, correct?
A. Correct.
Q. That's based on DO Cuni's statements to you?
A. That is correct.
Q. Did you see any rocks being thrown in any of the video that you reviewed?
A. I did not.
Q. Do you know if any rocks were recovered at the scene?
A. No.
Q. Do you know if any rocks were accessible under the snow that was on the ground?
A. I'm not aware at this time, no.
Q. You indicated that a Jeep Grand Cherokee was spray-painted, correct?
A. Correct.
Q. Now, that information was not in DO Cuni's original

statement taken by you, I guess, shortly after -- on December 15th of 2025, correct?
A. No.
Q. And where did you obtain that information that the Jeep Grand Cherokee was spray-painted?
A. Just from asking DO Cuni which vehicle had been spray-painted after the fact.
Q. That was after his interview?
A. After the interview, yes.
Q. And when did you make that inquiry?
A. That was last night actually.
Q. And that was as a result of Mr. Calhoun-Lopez telling you, I have some questions about whether a vehicle was actually spray-painted, right?
A. Yes.
Q. And have you seen any photos of that spray-painted vehicle?
A. I have not.
Q. Have you seen any damage estimates for removing the spray paint?
A. No. Typically our tech ops individuals at our office have the ability to remove some of that spray paint.
Q. But right now, other than DO Cuni telling you last night it was a Jeep Grand Cherokee, you have gathered no other witness statements or evidence related to the

spray-painting, correct?
A. Correct.
Q. Now, you indicated that individuals in the crowd, according to DO Cuni, were yelling, "kill yourselves," "eat your gun," correct?
A. Correct.
Q. Did you observe any or hear any of those statements on any of the audio or video that you have reviewed?
A. I did not.
Q. I believe DO Cuni claims that the defendant specifically said, "I'm going to kill you." Is that right?
A. I believe so.
Q. Did you hear that on any of the video you have reviewed?
A. I did not.
Q. You indicated DO Cuni told you that he would tell the defendant to back up; he would back up and then continue to advance when DO Cuni, like, would turn his back or start doing something else, right?
A. Correct.
Q. Did you observe that on any of the video that you watched?
A. We did.
Q. And what specifically did you observe on the video?
A. It was as DO Cuni had stated: where defendant would approach towards DO Cuni, he would be yelling, he held his

OC can up to try to deter individuals who continued to approach him, and as he would move, the defendant would continue to advance on his location.
Q. With fists clenched?
A. I believe I saw fists clenched in the video as well.
Q. You saw fists clenched in the video?
A. I believe so. It's been a while since I reviewed that video.
Q. Did you see the defendant square up in a fighting stance, as testified to -- or stated by DO Cuni in his statement to you?
A. I don't recall at this time.
Q. You indicated that DO Cuni told you that he sprayed the defendant with OC, correct?
A. Correct.
Q. And did you observe that on the video?
A. I did.
Q. At what point did that occur; what was happening at that time?
A. I believe DO Cuni was on the phone at that time trying to coordinate for, as he was saying, our Quick Reaction Force to show up, and he was continually being surrounded by individuals advancing towards him.
Q. And where was the defendant?
A. He was on the sidewalk area, like, right across from

where DO Cuni was.
Q. And about how far away was he from DO Cuni?
A. Best guess, a few feet away from him.
Q. Two to three?
A. I can't say exactly.
Q. Five to ten?
A. I would say closer, between three to five feet away.
Q. And at that point DO Cuni -- this is what you saw in the video?
A. Just on one of the clips that we had seen, yes.
Q. And was the defendant sprayed because DO Cuni sprayed the crowd in general, or did it appear to you he was specifically targeting the defendant?
A. It appeared to me he was specifically targeting the defendant.
Q. And was this prior to the assault?
A. Not sure exactly where in the timeline of events just because the video was fragmented Facebook Live videos they were able to determine, so there's nothing showing an actual clear timeline of all the events in the videos that we saw.
Q. So then let's go back to DO Cuni's statement to you. Did he give any timeline as to whether he sprayed OC on the defendant before or after he was assaulted by the defendant?
A. So, based on his statement, he said he had sprayed him before he was assaulted.

Q. And this would be while the woman who had spray-painted the vehicle was still in custody?

A. I believe so.

Q. Now, I'm trying to understand the assault. You have not seen this alleged assault on any of the video or audio that you have reviewed, correct?

A. That is correct.

Q. And the only individual you've interviewed was DO Cuni, correct?

A. Correct.

Q. And we believe from DO Cuni's use of the word "us" that more than one federal agent was assaulted and not tackled to the ground?

A. Correct.

Q. And how many individuals were involved in this assault, according to DO Cuni?

A. From his statement, multiple; he didn't really give an exact number. We knew the defendant and one other individual were the two that he named from the crowd, but he didn't really have a solid number of how many.

Q. What did DO Cuni tell you about where this defendant contacted DO Cuni, made physical contact; what portion of DO Cuni's body did this defendant make contact with?

A. I don't recall if he said from his statement what part of his body he made contact with.

Q. Well, how did the defendant tackle DO Cuni, according to DO Cuni?
A. Uh -- sorry, could you just explain?
Q. I guess, a tackle could mean maybe you do a leg sweep on someone or you shove them over or you hug them and fall to the ground. What did DO Cuni tell you about how this assault occurred?
A. From what I remember from his statement, he just said he was tackled. I don't remember him going into detail of, like, how the tackling actually was effected.
Q. And he said a number of people tackled him, correct?
A. Correct.
Q. "They tackled us."
A. That is correct.
Q. DO Cuni told you that he sprayed him because -- meaning the defendant -- because the defendant was about to throw a punch, correct?
A. I'd have to review his statement again for that exact verbiage.
Q. Do you recollect DO Cuni saying he was about to throw a punch and get physically assaulted so I sprayed him?
A. I don't recall from his statement. I'm sorry.
Q. Did you see any point at which the defendant was -- on the video you reviewed -- about to throw a punch at DO Cuni?
A. I don't recall seeing him about to throw a punch in any

of the videos we reviewed.
Q. And (pause) -- did DO Cuni tell you specifically that the defendant made physical contact with him or that he was just part of a scrum kind of that broke out?
A. He did.
Q. And what was the nature of that contact; what degree of force was involved?
A. He said it was enough that they went to the ground, and that's where they were fighting each other.
Q. And he said that specifically about the actions of this defendant, not the mob that assaulted him?
A. I'd have to review his statement again for that portion.
Q. Do you know what time of day it was when Officer Cuni called QRF, the Quick Reaction Force, for assistance?
A. Approximately, I want to say, around 1:00 p.m., maybe 2:00 p.m.
Q. You indicated that based on your investigation, the defendant was identified in his vehicle based on the jacket and mask that he was wearing, correct?
A. Correct.
Q. Was that jacket seized and taken into evidence?
A. No, it was not.
Q. Were the goggles allegedly worn by the defendant seized and taken into evidence?
A. They were not.

Q. Was the mask worn by the defendant seized and taken into evidence?
A. No.
Q. Now, I'm trying to figure out when this assault occurred based on your interview of DO Cuni. In terms of -- strike that. I'm sorry, I apologize.
Your complaint in this matter indicates that in your review of video, you observed Collyard grabbing the unidentified woman's leg and pulling her away from officers, correct?
A. Correct.
Q. Did the assault occur before or after that?
A. I'm not entirely sure.
Q. So, at that point there were just three federal agents on the scene when you observed the defendant grabbing the unidentified woman's leg. Is that right?
A. I believe so based on the video we were looking at; I didn't see any additional agents on scene at that time.
Q. And, I guess, then later on, Minneapolis Police Department officers arrived?
A. They did.
Q. And Hennepin County sheriff officers arrived?
A. Correct.
Q. And the Quick Reaction Force showed up?
A. We had additional agents there, yes.

Q. And would you agree that video shows an individual who you believe to be the defendant -- based on the jacket, goggles, and mask -- were still present on the scene when all these additional officers showed up?
A. Yes.
Q. And DO Cuni was still present on the scene?
A. Yes, he was.
Q. And did you observe any time or DO Cuni could directly observe this individual he believed to be the defendant based on the jacket, goggles, and mask after the alleged assault occurred?
A. So I believe just from the video footage I did see DO Cuni driving his Hyundai Palisade, and he said he saw the blue pickup truck coming up behind him, is how he was able to identify.
Q. And my question is before that; before the arrest of the defendant, there were still civilians milling around, all the other police agents that showed up were milling around, and the person you believed to be the defendant was still in the crowd, correct?
A. I believe at that time he was in his vehicle.
Q. Was any attempt made to arrest this defendant prior to observing him in his vehicle?
A. Not based on DO Cuni's statements; I don't think they had the man power at that time to do it.

Q. Again, that's why I asked you the question about Minneapolis police officers were on the scene, correct?
A. Correct.
Q. Do you know how many?
A. I don't know how many.
Q. Half a dozen, at least, from the video?
A. Probably a fair estimate.
Q. Hennepin County was on the scene?
A. Hennepin was.
Q. Quick Reaction Force finally responded?
A. Yes.
Q. How many federal agents responded in the QRF?
A. I'd say roughly 20 agents at that point, from the video. I don't know the exact number of how many were able to respond, though.
Q. And why wasn't there sufficient man power at that point; with MPD, Hennepin County, and the QRF on the scene, why wasn't there sufficient man power to arrest the defendant?
A. I believe that is when they did arrest the defendant because that's when DO Cuni was trying to leave the scene in his vehicle and saw the pickup truck behind him. And that's where they had enough man power to arrest at that point.
Q. You haven't seen any video that shows the alleged tackling of DO Cuni and other federal agents, correct?
A. Correct.

Q. Was another civilian arrested based on a suspicion of federal criminal charges at this incident?
A. Yes.
Q. And I have a last name of Noor, N-o-o-r, correct?
A. That is correct.
Q. Do you know if that individual has been charged?
A. Not yet.
Q. My understanding is that DO Cuni gave a statement identifying that individual as the primary instigator of this mob threatening violence against these outmanned I.C.E. officers, correct?
A. I believe he said that in his statement, yes.
Q. And he claimed that Mr. Noor directly participated in the tackling of himself, DO Cuni, and the other I.C.E. officer, correct?
A. Correct.
Q. And Mr. Noor, in fact, was -- once the QRF showed up, Mr. Noor was tackled, and taken to the ground, and put into a law enforcement vehicle, correct?
A. Correct.
Q. I'm just wondering why he hasn't been charged.
A. Uh, just based on our available man power right now and how many agents we have, it's just part of our process we're going through, still working through that.
Q. Well, what happened to Mr. Noor; was he taken to the

Sherburne County jail?

MR. CALHOUN-LOPEZ: I object, Your Honor, relevance.

THE COURT: Overruled.

THE WITNESS: He was not.

BY MR. NESTOR:

Q. Was he taken to the Bishop Henry Whipple building where I.C.E. officers are located?

A. He was.

Q. Was he interviewed?

A. We attempted to interview him, yes.

Q. And did he give a statement?

A. No, he did not.

Q. And then he was released from custody?

A. He was released pending charges, yes.

MR. NESTOR: I have no further questions, Your Honor.

THE COURT: Mr. Calhoun-Lopez?

MR. CALHOUN-LOPEZ: No redirect, Your Honor.

THE COURT: Okay.

Thank you, Agent. You may step down.

Would you like to present any argument, Mr. Calhoun-Lopez?

MR. CALHOUN-LOPEZ: Just briefly, Your Honor.

Your Honor, we do submit that there is ample

probable cause in this case to refer the complaint to the grand jury. I do think it's important, as the Court knows, but I'll say it again, that this was a chaotic scene; they were confronted by a mob. I think it's important to underscore that this is not a demonstration; this has become a mob. It's -- there were probably people there with very good intentions, but there was an undercurrent of violence, and it had turned into an attack on those agents. And these are federal agents who were only doing their duty.

It is easy to imagine them as I.C.E., capital letters, and as kind of a faceless representation of a government that people may disapprove of, but I think it's important to remember that they are human beings on the scene, and they are vulnerable to stress, especially when confronted by danger.

So it is a chaotic scene here, and I think that explains why some of this is a little -- is a little -- parts of -- not everything is exactly clear. We don't have a clear video record of everything that happened; we have the memory of a human being describing an assault on his person.

THE COURT: Mr. Calhoun-Lopez, was DO Cuni wearing a mask?

MR. CALHOUN-LOPEZ: Your Honor, we didn't submit that. I believe there were points -- may I confer, Your

Honor?

THE COURT: Yes, please.

*(Mr. Calhoun-Lopez confers with Special Agent Raiff)*

MR. CALHOUN-LOPEZ: I'm informed, Your Honor, that he was not.

THE COURT: Thank you.

MR. CALHOUN-LOPEZ: And we don't have a video record of it because these are fragmented snippets from Facebook Live and from other things. I think it's important to remember that the absence of proof is not proof of absence.

So, Your Honor, the testimony here does establish that Officer Cuni was performing his official duties, that he was intentionally assaulted, and that the defendant caused physical contact and was committing another felony, which is to say, accessory after the fact. And, so, based on all that, we do ask that the case be bound over and referred to the grand jury.

THE COURT: Thank you.

Mr. Nestor, argument?

MR. NESTOR: Thank you, Your Honor.

Your Honor, indeed it was a chaotic situation, and we would probably disagree as to what was causing the chaos. I don't know that that particularly matters other than as it affects DO Cuni's recollection is really he's the sole

source of information for the alleged assault.

I think the testimony is clear there is no video that captured this assault: we think because it didn't happen; the government says because video doesn't capture everything in any given moment in time. Certainly cases can proceed without video evidence.

In this case it's proceeding in terms of the assault almost entirely on the testimony of DO Cuni. That testimony is provided to us by Special Agent Raiff is simply too inconclusive and vague to support probable cause that this defendant intentionally made physical contact with DO Cuni.

The description is: they assaulted us. It's general; it's vague. It could include this defendant being pushed into DO Cuni as other individuals attempted to tackle him. There's no evidence sufficient to support probable cause of intentionality or of a sufficient level of force as opposed to an incidental touching.

Mr. Calhoun-Lopez made a closing comment that accessory after the fact was the other felony that the defendant had the intent to commit at the time of this assault. That is not set forth in the complaint. That's a new allegation now, and I don't have -- there's no testimony, in my view, as to what that other felony was.

The complaint specifically charges the defendant

with assault under 18, U.S.C. 111, parentheses A, against an individual engaged in the performance of official duties and cause physical contact and with the intent to commit another felony. And there's no testimony today or set forth in the complaint to support that, and is used in the conjunctive, not the disjunctive. And, in that, we would argue that the government has failed to establish probable cause for the charge as it chose to charge it.

It is necessary to have that level of intentional physical contact with -- in order for it to be a felony. Otherwise it's a misdemeanor to impede a federal officer. There is certainly no evidence to support that it's a felony because the defendant acted with intent to commit another felony. And we contend that there's not sufficient evidence of intent or the level of physical force to support the charge.

THE COURT: Thank you.

When deciding the issue of probable cause, the only thing this Court is supposed to consider is whether or not there is sufficient evidence in the complaint as alleged for a violation of the statute that is cited. And here the government has cited 18, United States Code, Section 111(a). And 111(a) can encompass both felony assaults and misdemeanor simple assaults. That statute includes forceable assaults, resists, opposes, impedence,

intimidates, or interferes with any person designated in Section 1114 of this title while engaged in or account of the performance of official duties.

The Court finds, therefore, that, at a minimum, there is at least probable cause for a simple assault under the statute, and the Court finds that there is probable cause in this complaint.

Anything further on behalf of the government, Mr. Calhoun-Lopez?

MR. CALHOUN-LOPEZ: No, Your Honor.

THE COURT: Anything further, Mr. Nestor?

MR. NESTOR: No.

THE COURT: Okay. Thank you. The Court is adjourned.

*(Court adjourned at 10:12 a.m.)*

* * *

I, Rachel C. Braun, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: *s/ Rachel C. Braun*
Rachel C. Braun, RPR-CRR-CRC